1  Joseph R. Taylor, Esq. (CA Bar No. 129933)
       jtaylor@linerlaw.com
2  Bennett A. Bigman, Esq. (CA Bar No. 115426)
       bbigman@linerlaw.com
3  Kim Zeldin, Esq. (CA Bar No. 135780)
       kzeldin@linerlaw.com
4  Kristina M. Fredericks, Esq. (CA Bar No. 230096)
       kfredericks@linerlaw.com
5  LINER GRODE STEIN YANKELEVITZ
   SUNSHINE REGENSTREIF & TAYLOR LLP
6  1100 Glendon Avenue, 14th Floor
   Los Angeles, California 90024-3503
7  Telephone:  (310) 500-3500
   Facsimile:  (310) 500-3501
8  Admitted Pro Hac Vice

9  Bruno Wolfenzon, Esq. (NV Bar No. 6177)
       bwolfenzon@wolfenzon.com
10 Daniel J. Reed, Esq. (NV Bar No. 11249)
       dreed@wolfenzon.com
11 WOLFENZON SCHULMAN & RYAN
   6725 Via Austi Parkway
12 Las Vegas, Nevada  89118
   Telephone: (702) 836-3138
13 Facsimile: (702) 836-3139

14 Attorneys for Defendant and Counterclaimant
   The Upper Deck Company

15

                    **UNITED STATES DISTRICT COURT**
16
                        **DISTRICT OF NEVADA**
17

18 ANIPLEX, INCORPORATED, a Japanese          )   Case No. 2:08-CV-00442-HDM-PAL
   corporation,                                )
19                                             )   [Assigned for all purposes to the
                Plaintiff and Counter-Defendant, )   Hon. Howard D. McKibben]
20                                             )
           vs.                                 )   **DECLARATION OF JOHN SEPENUK**
21                                             )   **IN SUPPORT OF DEFENDANT AND**
   THE UPPER DECK COMPANY, a Nevada           )   **COUNTERCLAIMANT THE UPPER**
   corporation,                                )   **DECK COMPANY'S MOTION FOR**
22                                             )   **SUMMARY JUDGMENT OR, IN THE**
                Defendant and                  )   **ALTERNATIVE, FOR SUMMARY**
23              Counterclaimant.               )   **ADJUDICATION OF ISSUES**
                                               )
24                                             )   **ORAL ARGUMENT REQUESTED**
                                               )
25                                             )   [Notice of Motion and Motion for Summary
                                               )   Judgment or, in the Alternative, for Summary
26                                             )   Adjudication; Memorandum of Points and
                                               )   Authorities in Support Thereof; Statement of
27                                             )   Undisputed Facts; and Declaration of
                                               )   Kristina Fredericks Filed Concurrently
28 _____ )   Herewith]

I, John Sepenuk, declare as follows:

1.      I am a former employee of The Upper Deck Company ("Upper Deck"). I make this declaration in support of Upper Deck's Motion for Summary Judgment or, in the Alternative for Summary Adjudication of Issues. Unless otherwise stated, I have personal knowledge of the matters stated herein and, if called upon, I could and would competently testify hereto. As to those matters about which I do not have personal knowledge, my statements are made upon information and belief.

2.      Upper Deck is incorporated in Nevada and manufactures and sells sports and entertainment trading cards and trading card games ("TCG"). Upper Deck's products include TCG involving animated characters and entertainment properties. I worked on and off as an employee or consultant for Upper Deck from 1997 through November 2008. I was initially a marketing manager for the Asia Pacific territories. From April 2003 until November 2008, I was employed at Upper Deck as Managing Director of Asia Pacific. Generally, my responsibilities as Managing Director of Asia Pacific included managing Upper Deck's relationship with Konami regarding the Yu-Gi-Oh! trading card game and overseeing the Asia Pacific territory for sales and distribution of Upper Deck's core products which were trading cards and some collectibles. In or about 2005, I was promoted to Vice President of International and my responsibilities increased to cover sales and distribution of Upper Deck's core products in Latin America. In 2007, my title changed to Vice President of Global Business Development. This was a shift in responsibility away from the bottom line sales-driven responsibilities and more towards global business development activities, which focused on original intellectual property development. Part of my responsibilities as Managing Director of Asia Pacific and Vice President of International included the responsibility for negotiating agreements with third parties such as Aniplex relating to "Kiba." I was the person at Upper Deck responsible for the management.

3.      In 2003, Upper Deck was approached by the Japanese Exchange Association ("JEA"), who held itself out as a representative of Dream Ranch, Inc. ("Dream Ranch"), regarding a merchandising license for products based on artwork and characters created by the Japanese artist, Susumu Matsushita, entitled "Kiba."

2

4.     Dream Ranch, by and through JEA, represented that there would be other licensees involved in the project, specifically, licensees for an animated television series, manga and video games. Attached hereto as Exhibit 1 is a true and correct copy of a January 20, 2003 email from Richard Privman at JEA to Jerry Bennington and myself describing the various potential "Kiba" licensees.

5.     On or about July 23, 2003, Upper Deck entered into a license agreement with Dream Ranch granting Upper Deck a license to create and sell trading cards and other merchandise based on the "Kiba" intellectual property in exchange for an initial minimum guarantee payment of $3 million. A true and correct copy of the July 23, 2003 agreement is attached hereto as Exhibit 2.

6.     In or about late 2003, Aniplex, Inc. ("Aniplex") became involved in the "Kiba" project as an anime producer. In or about late 2003, Aniplex approached Upper Deck about investing in a joint venture with Aniplex to produce an anime television series and to exploit the broadcast, home video and merchandising rights based on the "Kiba" intellectual property.

7.     I, and members of my team at Upper Deck, told Aniplex that Upper Deck would only invest in the "Kiba" joint venture if Upper Deck had an approval right over creative elements in the anime series. This approval right was important to Upper Deck to ensure that the series included the merchandising elements necessary to promote Upper Deck's planned "Kiba" TCG, and to ensure that Upper Deck could exploit the Kiba anime series in the markets anticipated as its exclusive territory. For example, attached hereto as Exhibit 3 is a true and correct copy of a December 19, 2003 email from Reid Middleton to Shigekazu Takeuchi of Sony Music Entertainment Japan ("Sony Music"), Aniplex's parent company, copying myself and others, attaching Upper Deck's comments to Aniplex's initial proposal for the "Kiba" anime. The proposal states "[t]he parties shall use best efforts to work together to develop the episodes with ample consideration given to ultimately merchandising the Property. *Aniplex shall not release an episode without first obtaining the approval of Upper Deck.*" (Emphasis added).

8.     In or about 2004, Aniplex agreed that the elements necessary to drive sales of Upper Deck's TCG would be incorporated into the content of the "Kiba" anime series. In or about 2004,

3

1   Aniplex also represented and promised that Upper Deck would have a creative voice in the "Kiba"

2   anime.

3       9.      In late 2004, Upper Deck and Aniplex began negotiating several "long form"

4   agreements memorializing their overall agreement relating to the licensing of the "Kiba"

5   intellectual property and the production of the "Kiba" anime series.  Numerous drafts of the "long

6   form" agreements were circulated and commented upon by both Upper Deck and Aniplex.  All of

7   the draft "long form" agreements that reflected Aniplex's license of rights in the "Kiba" intellectual

8   property to Upper Deck contained a representation and warranty to the effect that Aniplex had

9   obtained all necessary licenses, rights and contents for the exploitation of the "Kiba" property.

10  Attached hereto as Exhibit 4 are true and correct copies of a draft "License Agreement" and draft

11  "Television & Videogram License Agreement" attached to a January 26, 2005 email from Asa

12  Suehira to myself and others and a draft "License Agreement" and draft "Television and

13  Videogram License Agreement" attached to an July 6, 2005 email from Paul Swanson to Asa

14  Suehira, myself and others.

15      10.     In October 2005, Asa Suehira requested that the parties delay further negotiations of

16  the "long form" agreements and instead prepare a summary of the deal terms in the form of a short

17  form agreement (the "Short Form").  Attached hereto as Exhibit 5 is a true and correct copy of an

18  October 4, 2005 email from Asa Suehira to myself reflecting that request.

19      11.     During the negotiations of the Short Form, Aniplex initially resisted giving Upper

20  Deck a written approval right over the creative content of the "Kiba" anime.  Attached hereto as

21  Exhibit 6 is a true and correct copy of an October 20, 2005 email from Asa Suehira to Joshua

22  Grode, myself and others attaching comments to the draft Short Form and stating "UD will have no

23  approval over the creative."  I insisted, however, that the written agreement include a provision

24  giving Upper Deck creative approvals over the merchandising elements of the "Kiba" series.

25  Aniplex eventually agreed to give Upper Deck an approval right in or about November 2005.

26      12.     On or about December 10, 2005, the parties executed the Short Form.  The Short

27  Form contemplated that the parties would continue their negotiations on the "long form"

28  agreements and execute those agreements shortly after the Short Form was signed.  Despite

4

1   Aniplex's initial resistance, the Short Form contained the following provision relevant to Upper

2   Deck's right to approve the creative content in the "Kiba" anime:

3           UD and ANX have mutual approval over the script, main

4           character, designs and animatic for each episode.  In the event of a

5           deadlock, UD's decision controls with respect to merchandising

6           components (e.g., the number of shard battles between characters)

7           and ANX's decision controls in all other areas/components.

8          The Short Form also contained a provision requiring Aniplex to provide Upper Deck with

9   each written agreement entered into by the "Kiba" joint venture or by Aniplex on behalf of the joint

10  venture, and requiring that Aniplex provide Upper Deck with a summary of the material terms and

11  conditions of each verbal agreement entered into by the joint venture or by Aniplex on behalf of the

12  joint venture.  Attached hereto as Exhibit 7 is a true and correct copy of the Short Form.

13         13.    Immediately after the Short Form was executed the parties exchanged revised drafts

14  of the "long form" agreements, but they were not executed.  The draft agreements which reflected

15  Aniplex's license of rights in the "Kiba" intellectual property to Upper Deck continued to include a

16  representation and warranty to the effect that Aniplex had obtained all necessary licenses, rights

17  and consents required for the exploitation of the "Kiba" property.  Attached hereto as Exhibit 8 are

18  true and correct copies of a draft "License Agreement" and a draft "Television & Videogram

19  License Agreement" attached to a January 18, 2006 email from Asa Suehira to me.

20         14.    I am informed that there is an agreement between Aniplex and Madhouse, Inc.

21  ("Madhouse"), the company responsible for the actual production of the "Kiba" anime series (the

22  "Madhouse Agreement").  I am informed and believe that prior to commencement of this lawsuit,

23  Aniplex did not provide a copy of the Madhouse Agreement to Upper Deck..  As the person at

24  Upper Deck in charge of the management of the "Kiba" project, if Aniplex had provided a copy of

25  the Madhouse Agreement to Upper Deck, it would have been brought to my attention.  Prior to the

26  commencement of this lawsuit, I never saw a copy of the Madhouse Agreement.

27         15.    I am informed that the Madhouse Agreement does not give Aniplex the right to

28  require that Madhouse follow Aniplex's or Upper Deck's instructions regarding the creative

5

1  content of the "Kiba" anime series.  As the person at Upper Deck in charge of the management of

2  the "Kiba" project, if I had known that Aniplex lacked the ability to require Madhouse to make

3  Upper Deck's requested changes to the creative content in the "Kiba" anime series, Upper Deck

4  would not have entered into the Short Form with Aniplex.

5        16.    By July 2006, I became increasingly concerned that the "Kiba" anime series failed

6  to include the merchandising elements that were essential to drive the sales of Upper Deck's

7  "Kiba" TCG, and that the television series was inappropriate for television broadcast in any market

8  in Upper Deck's exclusive territory.  This led to a payment dispute between Aniplex and Upper

9  Deck under the Short Form.

10        17.    Upper Deck's "Kiba" TCG was released in Japan in July 2006.

11        18.    I am informed that on or about July 25, 2006, Susumu Matsushita Enterprises, Inc.

12  ("SME"), through its representative, sent Aniplex a letter stating that the "Kiba" anime series and

13  Upper Deck's "Kiba" TCG were unauthorized uses of the "Kiba" intellectual property ("SME

14  Claim Letter").  I am informed and believed that prior to commencement of this lawsuit, Aniplex

15  did not provide a copy of the SME Claim Letter to Upper Deck and did not bring SME's claims, as

16  detailed in that letter, to Upper Deck's attention in any manner.  As the person at Upper Deck in

17  charge of the management of the "Kiba" project, if Aniplex had provided a copy of the SME Claim

18  Letter to Upper Deck, it would have been brought to my attention.  Prior to commencement of this

19  lawsuit, I never saw a copy of the SME Claim Letter, nor was I made aware of the claims made in

20  that letter.

21        19.    On or about August 4, 2006, Aniplex sent Upper Deck a letter claiming that Upper

22  Deck was in breach of the Short Form.  A true and correct copy of that letter is attached hereto as

23  Exhibit 9.

24        20.    On or about August 17, 2006, Upper Deck sent a letter to Aniplex denying that it

25  was in breach of the Short Form and notifying Aniplex that it was in material breach of the Short

26  Form by violating Upper Deck's approval rights.  Attached hereto as Exhibit 10 is a true and

27  correct copy of that letter.

28

21.    In August 2006, when the above-referenced letters were sent, I am informed and believed that Aniplex still had not informed Upper Deck of the terms of the Madhouse Agreement or the rights issues raised in the SME Claim Letter. As the person at Upper Deck in charge of the management of the "Kiba" project, if Aniplex had informed Upper Deck of these issues, I would have been made aware of them, and I was not.

22.    From in or about September 2006 through early 2007, Aniplex and Upper Deck began negotiating a revision to the payment schedule in the Short Form in a draft agreement entitled the Amended and Restated Short Form Agreement ("A&R Short Form"), which was not executed by the parties. The unsigned "A&R Short Form" contained the same creative approval provision as in the Short Form. The "A&R Short Form" also contained the same provision requiring Aniplex to provide Upper Deck with each written agreement entered into by the "Kiba" joint venture or by Aniplex on behalf of the joint venture, and requiring that Aniplex provide Upper Deck with a summary of the material terms and conditions of each verbal agreement entered into by the joint venture or by Aniplex on behalf of the joint venture.

23.    On or about January 26, 2007, Aniplex sent Upper Deck another letter claiming that Upper Deck was in breach of the parties' agreement and demanding immediate payment by Upper Deck. Attached hereto as Exhibit 11 is a true and correct copy of that letter.

24.    I am informed and believed that at the time the January 2007 letter was sent, Aniplex still had not informed Upper Deck of the terms of the Madhouse Agreement or the rights issues raised in the SME Claim Letter. I am informed and believed that Upper Deck was unaware of both the terms of the Madhouse Agreement and the issues raised in SME Claim Letter As the person at Upper Deck in charge of the management of the "Kiba" project, if Aniplex had informed Upper Deck of these issues, I would have been made aware of them, and I was not.

25.    I am informed that Aniplex entered into agreements with Dream Ranch and SME in May 2007 that, for the first time, granted Aniplex a license related to the "Kiba" intellectual property. I am informed and believed that prior to the commencement of this action, Aniplex never provided a copy of those May 2007 agreements to Upper Deck. As the person at Upper Deck in

1 | charge of the management of the "Kiba" project, I would have been made aware of them.  I never

2 | saw those agreements.

3 |       26.     As the person at Upper Deck in charge of the management of the "Kiba" project, if I

4 | had known that neither Mr. Matsushita nor SME had consented to the license of the "Kiba"

5 | intellectual property in 2005, when Aniplex and Upper Deck were negotiating the Short Form,

6 | Upper Deck would not have entered into the Short Form with Aniplex and would have ceased

7 | negotiations regarding the A&R Short Form in late 2006 and early 2007.

8 |       27.     The SME Claim Letter and the fact that Aniplex did not have the right to license the

9 | "Kiba" intellectual property until May 2007,  would have been material to Upper Deck's decision

10 | regarding how to proceed with the "Kiba" project and how to respond to Aniplex's notices of

11 | breach in August 2006 and January 2007.

12 |       I declare under penalty of perjury that the foregoing is true and correct.

13 |

14 | Executed on this _28th_ day of _July_____, 2010, at _Irvine_____, California.

15 |

16 |

17 |                         John Sepenuk

0038528/017/ 469929v03